# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 41825

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

    Plaintiff-Respondent,

v.

RUSSELL HAFER,

    Defendant-Appellant,

and

JOHN DOES 1-10 as occupants of the
premises located at 402 South Lodestone
Avenue, Meridian, Idaho 83642,

    Defendants.
_____

RUSSELL and SANDRA HAFER,

    Third Party Plaintiffs-Appellants,

v.

AMERICAN HOME MORTGAGE
SERVICES, INC., and DOES 1-10,

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2015 Term

2015 Opinion No. 56

Filed: June 22, 2015

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Timothy L. Hansen, District Judge.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded</u>.

Townsend Law, P.C., Boise, for appellants. Jeffrey R. Townsend argued.

Perkins Coie, Boise, for respondent American Home Mortgage Servicing, Inc. Tonn K. Petersen argued.

RCO Legal, P.C., Boise, for respondent Federal National Mortgage Association. Lewis N. Stoddard argued.

_____

J. JONES, Justice

The Federal National Mortgage Association ("FNMA") purchased Russell Hafer's home[1] at a non-judicial foreclosure sale and filed an eviction suit when Russell and his wife, Sandra, refused to vacate. The Hafers claim that the foreclosure sale was invalid because their loan servicer, American Home Mortgage Services, Inc., now known as Homeward Residential, Inc. ("Homeward"), agreed to modify the terms of Russell's loan just prior to instituting foreclosure proceedings. They claim that Russell was therefore not in default at the time of the sale. The Hafers filed a third-party complaint against Homeward, stating eleven causes of action and asking the district court to quiet title in Russell. FNMA and Homeward filed a joint motion for summary judgment, arguing that there was no agreement to modify the loan terms because Russell did not sign and return a permanent loan modification agreement to Homeward by the specified deadline. The district court granted the motion in favor of FNMA and partially granted the motion in favor of Homeward, holding that there was no agreement between Homeward and Russell modifying Russell's loan because no Homeward representative signed an agreement. The Hafers make two arguments on appeal. First, they argue that the district court erred in considering the question whether an agreement had to be signed by a Homeward representative when that issue was not raised in the joint motion for summary judgment. Second, they argue that the district court erred substantively in concluding that there was no agreement to modify Russell's loan absent a signature from a Homeward representative.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Congress passed the Emergency Economic Stabilization Act in response to the economic crisis of the late 2000s. PL 110–343, Div. A, 122 Stat. 3765 (2008). The Act was designed to mitigate the effects of the recession by, among other things, "preserv[ing] home ownership." 12 U.S.C. § 5201. To that end, it authorized the Secretary of the Treasury to "implement a plan that seeks to maximize assistance for homeowners," encourage mortgage servicers to take advantage of existing options to minimize foreclosures, and "use loan guarantees and credit enhancements

---

[1] While both Russell and Sandra Hafer are parties to this action, the real property appears to be Russell's separate property.

to facilitate loan modifications to prevent avoidable foreclosures." *Id.* § 5219(a)(1). In 2009, the Secretary exercised this authority by implementing a number of programs, including the Home Affordable Modification Program ("HAMP").[2]

HAMP is an attempt to preserve home ownership by incentivizing mortgage loan servicers to enter into loan modification agreements with home owners at risk of foreclosure. Under the program, loan servicers enter into agreements with the Department of the Treasury to identify home owners who are at risk of foreclosure, but who may be able to stay in their homes with reduced mortgage payments. After contacting home owners who may benefit from the program, the servicer requests financial information to determine whether the home owner meets eligibility conditions for participation. If the home owner meets those initial eligibility conditions, the servicer provides the home owner with a Trial Period Plan ("TPP"), temporarily suspending payments under the original loan agreement and requiring payments at a revised rate determined by a formula promulgated by the Department of the Treasury. If the home owner successfully makes payments in accord with the TPP and provides additional documents establishing eligibility for a permanent loan modification, the servicer provides the home owner with a Permanent Modification Agreement ("PMA"). The Department of the Treasury pays servicers a fee for each such loan permanently modified.

Russell Hafer purchased the home in Meridian that is the subject of this action in January 2007. The purchase was financed through a loan secured by a deed of trust in favor of FNMA. Homeward has acted as servicer of the promissory note and trust deed. In August of 2010, Sandra was contacted by a Homeward representative who suggested that Russell may be eligible to participate in HAMP. Russell had previously fallen behind on payments and obtained loan modifications, which may have precipitated this contact. According to Sandra, the representative recommended that Russell fall behind on his mortgage payments to ensure his eligibility. Russell did so and then submitted an application to participate in HAMP in October of 2010. In March of 2011, Russell was approved for a TPP. Homeward sent Russell a letter dated March 15, 2011, informing him of his eligibility and instructing him that to secure a permanent modification he

---

[2] For a description of the operation of HAMP, *see* U.S. Dep't of Treasury, *Supplemental Directive 09-01: Introduction to the Home Affordable Modification Program* (April 6, 2009), *available at* https://www.hmpadmin. com/portal/programs/docs/hamp_servicer/sd0901.pdf. *See also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556–57 (7th Cir. 2012) (outlining the operation of HAMP).

must make all of his TPP payments and submit all required documents. Russell made all of his TPP payments and submitted all documents requested by Homeward.

Homeward approved Russell for a permanent modification and sent a PMA on June 28, 2011, which Russell completed and returned to Homeward. According to the transmittal letter, the PMA was due back to Homeward on July 13. Homeward first claimed that it did not receive the PMA until July 14 and later claimed that the PMA was improperly notarized. The Hafers claim that the first PMA was properly notarized and was delivered to Homeward on July 13. They support that claim with an affidavit from a notary public who claims to have notarized the document, and an attached UPS "Proof of Delivery" notice stating that a shipment sent by the Hafers was delivered to Homeward at 9:06 a.m. on July 13. It is undisputed that Homeward then sent a second PMA to Russell, but the parties disagree as to when the second PMA was sent and when it was due back to Homeward. Homeward claims that it was sent on July 14 and was due back no later than July 21. The Hafers claim that they were not told a second PMA was being sent until around July 26, did not receive it until around July 30, and that it was not due back until August 31. The second PMA was properly notarized on August 2 and was delivered to Homeward on August 3. By that time, Homeward had closed the loan modification file and sent a letter to Russell, dated July 26, stating that he was ineligible for participation in HAMP for failure to deliver a properly executed PMA. Homeward also sent a letter to Russell, dated July 30, asking him to begin the process of qualifying for a HAMP modification again. Russell did not do so.

The trustee of the deed of trust, Northwest Trustee Services, Inc., executed a notice of default on August 2, 2011. The notice was recorded the next day, a notice of a trustee's sale was issued on August 16, and the property was purchased by FNMA at the sale on December 15. FNMA filed a "Post Foreclosure Eviction Complaint for Ejection and Restitution of Property" in February of 2012. The Hafers answered and filed a third-party complaint against Homeward, asserting eleven causes of action:

(1)     Because Homeward contracted with Russell to modify his loan, Russell was not in default when the foreclosure sale occurred and the foreclosure sale was void.
(2)     Homeward improperly foreclosed on Russell's loan while he was being considered for participation in HAMP.
(3)     Homeward breached its contract to modify Russell's loan by foreclosing on the loan and selling the property.

| (4) | Homeward violated the covenant of good faith and fair dealing.[3] |
| (5) | When he stopped making payments after completing the TPP, Russell relied to his detriment on assurances from Homeward that his loan terms would be modified. |
| (6) | It is unconscionable to allow Homeward to benefit from its false assurances that Homeward would not proceed with foreclosure while Russell was being considered for participation in HAMP. |
| (7) | Homeward violated the Idaho Consumer Protection Act by initiating foreclosure proceedings after assuring Russell that there was no need to make his normal mortgage payments because he was under consideration for participation in HAMP. |
| (8) | Fraud |
| (9) | Negligence |
| (10) | Negligent infliction of emotional distress |
| (11) | Intentional infliction of emotional distress |

The Hafers asked the district court to quiet title in Russell, enforce the terms of Homeward's contract to modify Russell's loan, enjoin Homeward from foreclosure proceedings, award special and general damages, and make a variety of findings. In answering FNMA's complaint, the Hafers argued that the notices of both the foreclosure and trustee's sale were deficient and that the trustee's sale was void because it was a result of fraud, mistake, and breach of contract. They requested a jury trial.

Homeward and FNMA submitted a joint motion for summary judgment in February of 2013. Homeward argued that while Russell was offered a permanent loan modification, he failed to accept the offer because he failed to submit either the first or second PMA timely and properly notarized. According to Homeward, because there was no contract to modify the loan terms, Russell was in default and the foreclosure was proper. FNMA argued that the trustee's deed was properly recorded and that Idaho Code section 45-1510 provides that that fact constitutes prima facie evidence of compliance with the relevant notice requirements, evidence that the Hafers did nothing to rebut. FNMA also argued that any impropriety on the part of Homeward is irrelevant to FNMA's right to possession of the property.

After a hearing, the district court issued a memorandum decision and order addressing the joint motion for summary judgment. The court granted summary judgment dismissing eight of the Hafers' eleven claims against Homeward, refusing to grant summary judgment only as to the

---

[3] In their complaint, the Hafers titled their fourth cause of action "unclean hands," but then in the text alleged both an equitable unclean hands theory and a violation of the covenant of good faith and fair dealing. In its memorandum decision, the district court utilized the unclean hands title for the count but discarded the unclean hands theory and ruled upon the covenant of good faith and fair dealing theory, denying summary judgment.

5

second, sixth, and seventh. As to the claims it left in the case, the court concluded there was a disputed question of fact whether the letter dated July 30 from Homeward to Russell, suggesting that Russell may qualify for participation in HAMP and asking him to begin the application process anew, communicated that Russell was being considered for HAMP and that Homeward would not foreclose while he was under consideration. The district court granted summary judgment in favor of FNMA as to its claim for possession based on its conclusion that Russell was in default under the promissory note and deed of trust.

The district court entered judgment in favor of FNMA and certified the judgment as final under I.R.C.P. 54(b). The Hafers timely filed a notice of appeal. The district court then entered judgment dismissing the Hafers' first, third, fourth, fifth, ninth, tenth, and eleventh causes of action against Homeward, with prejudice, and dismissing the Hafers' eighth cause of action without prejudice. The judgment was certified as final under I.R.C.P. 54(b). The Hafers timely filed an amended notice of appeal.[4]

## II.
## ISSUES ON APPEAL

1. Whether the district court erred in granting summary judgment dismissing the Hafers' first, third, and fourth causes of action against Homeward.

2. Whether the district court erred in granting summary judgment in favor of FNMA.

3. Whether the Hafers are entitled to attorney fees on appeal under Idaho Code section 12-120(3).

## III.
## STANDARD OF REVIEW

When reviewing an order for summary judgment, this Court applies the same standard of review as was used by the trial court in ruling on the motion for summary judgment. *See Cristo Viene Pentecostal Church v. Paz,* 144 Idaho 304, 307, 160 P.3d 743, 746 (2007). Summary judgment is proper if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). "If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review." *Cristo,* 144 Idaho at 307, 160 P.3d at 746.

"It is axiomatic that upon a motion for summary judgment the non-moving party may not rely upon its pleadings, but must come forward with evidence by way of affidavit or otherwise which contradicts the evidence submitted by the moving party, and

---

[4] On appeal, the Hafers argue that the district court erred in dismissing their first, third, and fourth causes of action, and in granting summary judgment in favor of FNMA. They do not address the district court's dismissal of their fifth, eighth, ninth, tenth, and eleventh causes of action.

6

which establishes the existence of a material issue of disputed fact." *Zehm v. Associated Logging Contractors, Inc.,* 116 Idaho 349, 350, 775 P.2d 1191, 1192 (1989). This Court liberally construes all disputed facts in favor of the nonmoving party, and all reasonable inferences drawn from the record will be drawn in favor of the nonmoving party. *Cristo,* 144 Idaho at 307, 160 P.3d at 746. If reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented, then summary judgment is improper. *McPheters v. Maile,* 138 Idaho 391, 394, 64 P.3d 317, 320 (2003).

*Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 383, 210 P.3d 63, 68 (2009).

## IV.
## DISCUSSION

**A. The district court erred in dismissing the Hafers' first, third, and fourth causes of action against Homeward.**

The Hafers' first, third, and fourth causes of action—their claim that Homeward improperly foreclosed when Russell was not in default, their breach of contract claim, and their claim for violation of the covenant of good faith and fair dealing[5]—presuppose the existence of an agreement between Homeward and Russell to modify the terms of Russell's loan. Likewise, the Hafers defend against FNMA's claim for possession on the ground that an agreement with Homeward modified Russell's loan so that he was not in default at the time of the foreclosure sale.

The district court dismissed the Hafers' claims and granted summary judgment in favor of FNMA because it concluded that "the Hafers have not demonstrated a genuine issue of material fact as to whether a binding contract to modify the loan was executed." The court pointed to the fact that the Hafers had presented no evidence that a Homeward representative signed and returned a PMA to Russell. The court relied on a single provision of the PMA to conclude that, absent a signature from a Homeward representative, Homeward did not agree to modify Russell's loan:

> the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.

---

[5] "The covenant [of good faith and fair dealing] requires that the parties perform, in good faith, the obligations imposed by their agreement, and a violation of the covenant occurs only when either party violates, nullifies or significantly impairs any benefit of the contract." *Shawver v. Huckleberry Estates, L.L.C.*, 140 Idaho 354, 362, 93 P.3d 685, 693 (2004).

The central dispute between the parties concerns whether Homeward made an offer to modify Russell's loan that Russell accepted, even if Homeward never signed a PMA.[6]

In support of their claim that Homeward made an offer that Russell accepted by completing his TPP payments and returning the documents requested by Homeward, the Hafers cite Homeward's repeated statements that it was making an offer that could be accepted in that manner. In the March 15, 2011, letter approving Russell to enter a TPP, he is informed by Homeward that "[t]o qualify for a permanent modification, you must make the following trial period payments in a timely manner . . . . After all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified." The same letter provided that "[t]o accept this offer," Russell needed only make his first TPP payment. Next, in the letter accompanying the first PMA, dated June 28, 2011, Homeward congratulates Russell on his eligibility for a loan modification. He is informed that if he makes his remaining TPP payments, if any, Homeward "will modify your mortgage loan and waive prior late charges that remain unpaid." The letter outlines a two-step process for "How to Accept This Offer." The first step instructs Russell that

> [t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by 07/13/2011. If the Modification Agreement has notary provisions at the end, you must sign both copies before a notary public and return the notarized copies to us.

Step two informs Russell of the need to continue making any remaining TPP payments. It is only when one looks to the fine print of the PMA accompanying the June 28, 2011, letter that one finds any indication that Homeward might yet claim the unilateral right to refuse to modify Russell's loan no matter how compliant Russell had been. Section 3 of the PMA states that:

> If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met,

---

[6] The Hafers also argue that the district court should not have considered the question whether a signature from a Homeward representative was required to form a contract because that issue was not raised in the joint motion for summary judgment. The Hafers are correct that the district court erred in raising the issue *sua sponte*. "[A] district court may not decide an issue not raised in the moving party's motion for summary judgment." *Harwood v. Talbert*, 136 Idaho 672, 678, 39 P.3d 612, 618 (2001). "The party against whom the judgment will be entered must be given adequate advance notice and an opportunity to demonstrate why summary judgment should not be entered." *Id.* (internal quotation marks omitted). Whether a signature from Homeward on a PMA was required before a contract would be formed, even if the PMA was signed, notarized, and timely delivered by Russell, is a different issue than whether Russell managed to return a PMA to Homeward signed, notarized, and by the due date. The Hafers were not given notice that they needed to address the former issue when Respondents moved for summary judgment arguing that there was no dispute of fact regarding the latter. As a result, the district court erred in granting summary judgment on an issue not raised in Respondents' joint motion for summary judgment. Because we hold that the district court erred substantively in its analysis, however, we need not rule on this ground.

the Loan Documents will automatically become modified on July 1, 2011 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived.

Section 2 is titled "Acknowledgements and Preconditions to Modification." One of those preconditions, Section 2B, provides that the loan documents will not be modified "unless and until the Lender accepts this Agreement by signing and returning a copy of it to me, and the modification Effective Date (as defined in Section 3) has occurred."

These various statements appear to be conflicting. On the one hand, Russell was repeatedly told that he had received an offer for a loan modification that he could accept by making all of his TPP payments and providing all requested documents. If Russell did so, Homeward promised that his loan "will be permanently modified." On the other hand, the PMA appears to condition any modification of the loan on the signature of a Homeward representative. In determining that the PMA was not effective, absent a signature from a Homeward representative, the district court looked only to its Section 2B. It did not address any of the language in the letter accompanying the PMA, or the language in the earlier letter dated March 15, 2011.

A large number of courts in a variety of jurisdictions have addressed similar issues involving HAMP modifications and have reached varying conclusions. *See* Tammy J. Raduege, Annotation, *Enforceability of Trial Period Plans (TPP) Under the Home Affordable Modification Program (HAMP)*, 88 A.L.R. Fed. 2d 331 (2014) ("Many homeowners have entered into TPPs and have been disappointed when the loan servicer refused to make a permanent modification and instead foreclosed on the home. This scenario has led to a deluge of mostly federal litigation where frustrated homeowners assert state law claims seeking to enforce the TPP agreement. Courts have varied widely in their holdings on these claims.").[7] In one of the

---

[7] Many of these cases involve questions not at issue here. For instance, some courts have dismissed contract-based claims arising out of HAMP due to a failure of consideration. *See*, *e.g.*, *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1346–49 (S.D. Fla. 2011). *But see*, *e.g.*, *Sutcliffe v. Wells Fargo Bank, N.A.*, 283 F.R.D. 533, 552–53 (N.D. Cal. 2012) (holding that home owners incur additional obligations under TPPs and those obligations may constitute adequate consideration). In their reply in support of summary judgment, Respondents alleged that there was a failure of consideration, but did not do so in their initial memorandum in support of summary judgment. The district court did not address the consideration argument in its order and Respondents do not press it on appeal. Some courts have also dismissed contract-based claims arising out of HAMP on the ground that the absence of a statutory, private right of action to enforce HAMP precludes such claims. *See*, *e.g.*, *Schwartz v. Chase Home Fin., LLC*, No. CV-10-2120-PHX-FJM, 2011 WL 1933738, at *1 (D. Ariz. May 19, 2011). *But see*, *e.g.*, *Stagikas v. Saxon Mortgage Servs., Inc.*, 795 F. Supp. 2d 129, 135–36 (D. Mass. 2011) (noting that, even if HAMP does not include a private right of action to enforce the terms of the program, servicers who participate in HAMP may yet enter into contracts enforceable under state law). *See also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576–85

leading cases, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), Wells Fargo refused to grant a permanent loan modification to a home owner, Wigod, who had completed all of the requirements of the TPP and timely returned all requested documents. *Id.* at 558. In refusing to modify the loan, Wells Fargo relied on language nearly identical to the language relied upon by Homeward in this case. *Id.* at 563. On appeal from the grant of Wells Fargo's motion to dismiss, the Seventh Circuit held that Wells Fargo made an offer for a loan modification that Wigod accepted by making the TPP payments and delivering the appropriate documents to Wells Fargo. *Id.* The court emphasized that Wells Fargo repeatedly characterized the TPP as an offer for a loan modification that could be accepted by making the TPP payments and providing the requested documents. *Id.* at 561–62. As to the provision cited by Wells Fargo, the court held that Wells Fargo's reading as permitting it to simply refuse to sign a PMA and modify the loan

> would nullify Wells Fargo's obligation to "send [Wigod] a Modification Agreement" if she "compl[ied] with the requirements" of the TPP and if her "representations . . . continue to be true in all material respects." Under Wells Fargo's theory, it could simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like Wigod—and there would still be no breach. Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail. In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion.

*Id.* at 563 (internal citations omitted). *See also Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 883 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013) (with facts nearly identical to *Wigod*, holding that the signature provision "cannot convert a purported agreement setting forth clear obligations into a decision left to the unfettered discretion of the loan servicer").[8]

---

(7th Cir. 2012) (analyzing and rejecting various theories according to which the absence of a private right of action in HAMP might preclude state law contract claims arising out of HAMP modifications). Respondents made this argument briefly in their memorandum in support of summary judgment, but the district court did not address it because it held that there was no contract in the first instance. Respondents do not press this argument on appeal. Because the district court did not pass on either argument below and neither argument was raised or briefed on appeal, we do not consider them here.

[8] *Corvello* reversed two consolidated cases. The district court in this case relied heavily on one of the district court cases later reversed in *Corvello—Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059 (N.D. Cal. 2011) *rev'd sub nom. Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013).

We find the reasoning in *Wigod* persuasive. "Formation of a valid contract requires a meeting of the minds as evidenced by a manifestation of mutual intent to contract. This manifestation takes the form of an offer followed by an acceptance." *Justad v. Ward*, 147 Idaho 509, 512, 211 P.3d 118, 121 (2009) (internal citations omitted). "An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Intermountain Forest Mgmt., Inc. v. Louisiana Pac. Corp.*, 136 Idaho 233, 237, 31 P.3d 921, 925 (2001) (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 30(2) (1981)). The existence and nature of the offer "is judged by its objective manifestations, not by any uncommunicated beliefs, mental reservations, or subjective interpretations or intentions of the offeror." 17A Am. Jur. 2d *Contracts* § 49 (footnotes omitted). "[T]he offeror controls the terms of acceptance, and an acceptance is often defined as a manifestation of assent to the terms of an offer, made by the offeree in the manner invited or required by the offer. The offeror may prescribe conditions as to the mode of acceptance." *Id.* § 92 (footnotes omitted). "Generally the determination of the existence of a sufficient meeting of the minds to form a contract is a question of fact to be determined by the trier of facts." *Shields & Co. v. Green*, 100 Idaho 879, 882, 606 P.2d 983, 986 (1980).

Here, Homeward clearly communicated to Russell that it was making an offer. The March 15, 2011 letter sent by Homeward explicitly characterizes itself as doing so and instructs Russell how to accept. It promises that Russell's loan "will be permanently modified" if he timely makes his TPP payments and submits the documents requested by Homeward. It does not contain the slightest hint that Homeward can unilaterally, for any reason or none, refuse to grant a permanent modification even if Russell made all of his TPP payments, remained eligible for a permanent modification, and submitted all of the documents requested by Homeward. The letter clearly conditions the permanent modification on compliance with the program, not on the whim of Homeward. Likewise, the June 28, 2011 letter accompanying the PMA promises a permanent modification if Russell returns the PMA signed and notarized by the appropriate date, having made all of his TPP payments. It also makes no mention of Homeward having unbridled discretion to refuse a permanent loan modification.

If Homeward made an offer for a permanent loan modification that was accepted by Russell when he completed his TPP payments and timely delivered all requested documents, the

11

PMA cannot unilaterally walk back Homeward's existing obligation to modify the loan. That is so even if the signature provision is read as an unambiguous attempt to provide Homeward with unbridled discretion to refuse a permanent modification. To the extent that Homeward's communications with Russell are conflicting and ambiguous, the signature provision should be construed against Homeward. "[I]f two clauses relating to the same thing are so repugnant that they cannot stand together, the first will be received and the later one rejected, especially when the latter is inconsistent with the general purpose and intent of the instrument and would nullify it." *Morgan v. Firestone Tire & Rubber Co.*, 68 Idaho 506, 518, 201 P.2d 976, 983 (1948). The letter Homeward sent to Russell on March 15, 2011 states: "The Making Home Affordable Program was created to help millions of homeowners refinance or modify their mortgages. As part of this program, we—your mortgage servicer—and the Federal Government are working to offer you options to help you stay in your home." The June 28 letter contained almost identical language. A provision that permits Homeward to unilaterally and arbitrarily refuse to grant a permanent modification and foreclose on a home owner who qualifies, has made all TPP payments, and has submitted all of the required paperwork is inconsistent with the goal of helping home owners to modify their loans and stay in their homes. This is also a contract of adhesion drafted by Homeward. A contract of adhesion is "an agreement between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take-it-or-leave-it basis.'" *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 43, 72 P.3d 877, 883 (2003). Ambiguities in a contract of adhesion should be construed against the drafter. *See Farm Bureau Ins. Co. of Idaho v. Kinsey*, 149 Idaho 415, 419, 234 P.3d 739, 743 (2010) ("Because insurance policies are contracts of adhesion that are not usually subject to negotiation between the parties, any ambiguity in a policy is construed strongly against the insurer."). *See also Werry v. Phillips Petroleum Co.*, 97 Idaho 130, 136, 540 P.2d 792, 798 (1975) ("Where there is doubtful language in a contract, it will be interpreted most strongly against the party who provided that language.").[9]

---

[9] Though not dispositive, Department of Treasury guidance on HAMP suggests that servicers are not intended to have unfettered discretion to refuse a modification to a home owner who is eligible, completes the TPP program, and submits all required documents. According to the Department, "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification *will become effective* on the first day of the month following the trial period as specified in the Trial Period Plan." U.S. Dep't of Treasury, *Supplemental Directive 09-01: Introduction to the Home Affordable Modification Program* 18 (April 6, 2009), *available at*

Respondents rely primarily on this Court's decision in *Intermountain Forest Management, Inc. v. Louisiana Pacific Corporation*, 136 Idaho 233, 31 P.3d 921 (2001), for the proposition that Homeward did not offer to modify Russell's loan. Intermountain Forest Management's ("IFM") President, Gary Briggs, and a Louisiana Pacific Corporation ("LPC") employee, Laurie Stone, were discussing a logging contract when Briggs suggested terms, Stone recorded those terms on an unsigned contract, and Briggs signed without making changes. *Id.* at 234–35, 31 P.3d at 922–23. Briggs was aware at the time that Stone was not authorized to sign the contract and that it would need to be reviewed, approved, and signed by a supervisor, but the contract was never executed by a representative of LPC. *Id.* When IFM sued for breach of contract, this Court affirmed the district court's grant of summary judgment dismissing the claim. *Id.* at 236, 31 P.3d at 924. IFM argued that when Stone presented the unsigned contract to Briggs, doing so constituted an offer that Briggs accepted by signing. *Id.* at 237, 31 P.3d at 925. This Court noted that a communication does not constitute an offer "if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." *Id.* (quoting Restatement (Second) of Contracts § 26 (1981)). The Court held that "[t]he undisputed facts in the record reasonably support the district judge's conclusion that the presentation of the contract to Briggs for a signature was not an offer and Briggs was not justified in assuming his assent would conclude the bargain . . . ." *Id.*

According to Respondents, because the PMA included the provision requiring a signature from a Homeward representative, Russell "had reason to know that Homeward did not intend to conclude a bargain until Homeward had made a further manifestation of assent." The facts of this case are clearly distinguishable from those in *Intermountain Forest*. In *Intermountain Forest*, Briggs knew when presented with the unsigned contract that the purported offeror, Stone, was not authorized to make an offer. *Id.* at 238, 31 P.3d at 926. There was simply no question that

---

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf (emphasis added). Likewise, the Department states that:

> *The servicer must execute and return a copy of the fully executed modification agreement to the borrower promptly*, but no later than 30 calendar days after receipt of the agreement executed by the borrower, and the borrower's compliance with all conditions set forth in the trial period plan notice and Section 1 of the modification agreement.

U.S. Dep't of Treasury, *Making Home Affordable Program: Handbook for Services of Non-GSE Mortgages* 131 (March 3, 2014), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_44.pdf (emphasis added).

Briggs, the purported offeree, was not justified in understanding that his assent would conclude the bargain. Because both parties knew that Stone was not authorized to make an offer, Stone was not making an offer. Here, the communications were coming directly from Homeward to Russell. Russell had no reason to believe that Homeward was not authorized to offer a modification of his loan, or that Homeward was doing anything other than making such an offer when it explicitly stated that it was doing so and instructed Russell how to accept.

Homeward argues that "[t]here was no binding contract because, simply, there was no meeting of the minds." According to Homeward, the fact that it sent a second PMA to Russell shows that it did not believe that a contract was formed when Russell returned the first PMA. Likewise, the fact that Russell attempted to return the second PMA shows that he did not believe that a contract was formed when he returned the first PMA. As a result, Homeward claims, there could have been no meeting of the minds as required to form a contract.[10]

"An offer is judged by its objective manifestations, not by any uncommunicated beliefs, mental reservations, or subjective interpretations or intentions of the offeror." 17A Am. Jur. 2d *Contracts* § 49. Likewise, "[a] response to an offer amounts to an acceptance if an objective, reasonable person is justified in understanding that a fully enforceable contract has been made, even if the offeree subjectively does not intend to be legally bound." *Justad*, 147 Idaho at 512, 211 P.3d at 121 (quoting 17A Am. Jur. 2d *Contracts* § 91). Whether there was a meeting of the minds is an objective inquiry that does not focus on the subjective beliefs or intentions of Russell or Homeward. As discussed above, Homeward's communications with Russell strongly suggested that it was making an offer for a permanent loan modification that Russell could accept by making his TPP payments and providing all documents requested by Homeward. If he did those things, an objective, reasonable person would be justified in understanding Russell as having accepted. That is so even if Homeward subjectively thought that Russell did not accept and even if Russell later thought he might be required to submit a second PMA.

Homeward made an offer for a permanent loan modification in its letter of March 15, 2011, and instructed Russell that to accept he needed to complete his TPP payments and submit all of the documents requested by Homeward. If Russell accepted in the manner dictated by Homeward, Homeward cannot subsequently assert the right to unilaterally refuse a permanent

---

[10] This argument is addressed only to the effect of the first PMA.

loan modification. The district court erred in concluding that the signature provision of the PMA entitled Homeward to do so.

Respondents further contend that they were entitled to summary judgment because, even if Homeward made an offer for a permanent loan modification, there is no genuine dispute that Russell failed to accept it because he did not return a properly notarized PMA by the deadline. Respondents make two arguments. They first contend that the first PMA arrived at their office a day late. They then argue that, even if the document was timely returned, it was not properly notarized. They do not contend that Russell had not signed it in the proper place.

The summary judgment record is remarkably incomplete and confused when it comes to the key documents at issue in this case. In support of summary judgment, Cindi Ellis, the Vice President of Homeward, submitted an affidavit including three attachments. The attachments are identified in the affidavit as being (A) the letter sent by Homeward, dated March 15, notifying Russell of his eligibility for a TPP; (B) the first PMA sent by Homeward on June 28 and returned on either July 13 or 14 and the accompanying letter; and, (C) the second PMA, mailed by Homeward either on or after July 14 and returned to Homeward, signed and notarized by Russell, on August 3. The affidavit misidentifies attachments B and C, however. Attachment C is the letter dated July 26 from Homeward to Russell, notifying him that he is not eligible for participation in HAMP for failure to timely return a properly notarized PMA. Though Attachment B includes a letter dated June 28, 2011, congratulating Russell on his eligibility for a HAMP modification and referencing an attached PMA, the PMA included as part of Attachment B is signed by Russell on July 26 and was notarized August 2. That document is apparently the second PMA. The first PMA is not part of the record, despite what Ellis' affidavit claims, and neither is any letter accompanying the second PMA. During oral argument before the Court, Homeward's counsel advised that the first PMA and the transmittal letter for the second PMA were not in Homeward's files and could not be found.

The first PMA was due back to Homeward no later than July 13, 2011. Respondents claim that it was not received until July 14. To support their claim that the PMA was late, Respondents cite Cindi Ellis' affidavit as claiming that Homeward's business records reflect the PMA was received on July 14. Ellis did not include those records as an attachment to her affidavit and they are not included by Respondents elsewhere in the record. In support of their claim that the PMA was delivered on July 13, the Hafers both submitted affidavits in which they

15

testify that they sent the PMA to Homeward by UPS overnight delivery on July 12. Sandra attached a UPS notice of delivery of the shipment to Homeward at 9:06 a.m. on July 13, 2001. In her affidavit, Sandra testifies that she was informed by Homeward in a phone call on July 26 that it had not received the PMA but that in a subsequent conversation Homeward "acknowledged that they received the [PMA], but that it was not properly notarized." Respondents do not address this evidence.

Respondents also argue that there is no genuine dispute of fact that the first PMA was improperly notarized. As an initial matter, it is not clear that to accept Homeward's offer Russell was required to have the PMA notarized. While the letter of June 28, 2011, instructs Russell that the attached PMA must be notarized, the March 15, 2011, letter provided that Russell's loan "will be permanently modified" if he timely made his TPP payments and "submitted all the required documents." There is no dispute that Russell made all of his TPP payments and submitted all of the documents required by Homeward, including the PMA, even if that document was not notarized.[11]

Even assuming that Russell was required to have his signature notarized in order to accept Homeward's offer, the Respondents do not so much as gesture at an explanation concerning how the document was improperly notarized. Because the first PMA is not in the record, there is no direct evidence as to how the document was notarized. Instead, Respondents cite only Cindi Ellis' affidavit as claiming that Homeward's business records state that the first PMA was improperly notarized. She makes the conclusory statement that the document "was not properly notarized and was therefore invalid." No supporting business records are included in the summary judgment record. In oral argument before the Court, Homeward's counsel was unable to explain how the notarization of the first PMA was improper. Since Homeward appears to have lost the first PMA, and since Homeward does not say how the notarization is improper, there is no competent evidence in the record to indicate that there was any infirmity in the notarization of the first PMA. The Hafers claim in separate affidavits that Russell signed the first PMA in front of a notary public on July 8, 2011. Russell states that he believes he signed in the correct area and that the document was properly notarized. The Hafers also introduced an affidavit from a

---

[11] Department of Treasury guidance on HAMP states: "Note: the borrower is not required to have the Agreement notarized." U.S. Dep't of Treasury, *Supplemental Directive 09-01: Introduction to the Home Affordable Modification Program* 15 (April 6, 2009), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp _servicer/sd0901.pdf.

16

notary public, Clela N. Hoadley, who states she notarized a document for Russell on July 8, 2011, and that she has "never been accused of improperly notarizing a document, or notarizing a document in the wrong place."

As to the second PMA, the parties disagree only as to whether it was timely returned to Homeward. Though they agree it was returned to Homeward on August, 3, 2011, they disagree as to when it was due. According to Respondents, the second PMA was sent to the Hafers on July 14 and was due July 21. Though what appears to be the second PMA is in the record,[12] the letter that accompanied the second PMA is not. Because the letters that accompanied the PMAs, and not the PMAs themselves, provided the relevant deadlines, there is no direct evidence as to when the second PMA was due. Cindi Ellis' affidavit claims that the second PMA was due by July 21. According to Sandra, the letter accompanying the second PMA directed them to return it by August 31. Homeward argues that the Hafers might be confusing two documents in claiming that the second PMA was due August 31. The Hafers acknowledge that Homeward sent Russell a letter, dated July 30, notifying him that he may be eligible to participate in HAMP and asking him to start the process of qualifying for a permanent modification anew. That letter states that the financial information he needed to provide to qualify was due August 31. According to Homeward, the Hafers might have confused the deadline for return of the second PMA with the deadline for return of the new application for a HAMP modification.

There is simply no way to sustain the judgment in favor of Homeward on the Hafers' first, third and fourth causes of action. Therefore, we vacate the judgment in favor of Homeward on the first, third and fourth causes of action, and remand the case for further proceedings consistent with this opinion.

**B. The district court erred in granting summary judgment in favor of FNMA.**

The Hafers argue that the district court erred in granting summary judgment in favor of FNMA because Russell's agreement with Homeward resolved his default. They claim that, as a result, Russell was not in default at the time of the non-judicial foreclosure sale, the sale was invalid, and FNMA is not entitled to possession of the property. Respondents argue that the

---

[12] The second PMA appears to be signed by Russell and properly notarized.

17

district court properly granted summary judgment on FNMA's claim for possession because the trustee's sale was final and cannot now be invalidated.[13]

Idaho Code section 45-1505 provides, in part, that a

> trustee may foreclose a trust deed by advertisement and sale under this act if . . . (2) [t]here is a default by the grantor or other person owning an obligation the performance of which is secured by the trust deed or by their successors in interest with respect to any provision in the deed which authorizes sale in the event of default of such provision.

In *Taylor v. Just*, 138 Idaho 137, 59 P.3d 308 (2002), this Court held that Idaho Code section 14-1505(2) "requires that the default exist at the time of the sale. It states that the trustee may foreclose a trust deed if there 'is' a default by the grantor, not if there 'has been a default by the grantor.'" *Id.* at 140, 59 P.3d at 311. In *Taylor*, because the home owners had resolved their default by agreement prior to the foreclosure sale, the Court held that the foreclosure sale was not authorized by statute and was void. *Id.* at 141, 59 P.3d at 312.

The March 15, 2011, letter provides that Russell's "existing loan and loan requirements remain in effect and unchanged during the trial period." With respect to foreclosure, Homeward states that "if [Russell] makes [his] new payments timely, **we will not conduct a foreclose sale**" (emphasis in original). Homeward claims that it may proceed to foreclose on the loan, though, if Russell is "notified in writing that [he] failed to comply with the terms of the trial period plan or do[es] not qualify for a permanent loan modification." The letter is clear, then, that Russell's present default was not resolved during the TPP period, and that the possibility of foreclosure was contingent on his failure to successfully complete TPP payments or qualify for a permanent loan modification. There is no dispute that Russell completed his TPP payments and qualified for a permanent loan modification. In a "Frequently Asked Questions" section of the letter, in response to the question when Russell would know if his loan would be permanently modified, Homeward states that Russell will be sent a PMA "detailing the terms of the modified loan" when he completes his TPP payments. Coupled with Homeward's assurance that Russell's loan "will be permanently modified" if he completes his TPP payments, remains qualified, and

---

[13] Below, the Hafers also argued that the notice of default and notice of trustee's sale did not meet the requirements of Idaho Code sections 45-1505(3) and 45-1506. The district court rejected this argument. It determined that the trustee's deed was properly recorded and included recitals addressed to the relevant notice requirements. "When the trustee's deed is recorded in the deed records of the county where the property described in the deed is located, the recitals contained in the deed . . . shall be prima facie evidence in any court of the truth of the recitals and the affidavits." I.C. § 45-1510(1). The district court held that the Hafers did not identify the manner in which notice was deficient and did nothing to rebut the prima facie evidence of compliance with the notice requirements. On appeal, the Hafers do not argue that the district court erred by so holding.

submits the required documents, the letter suggests that the loan is modified when Russell completes the TPP, is informed he is qualified, and returns the PMA to Homeward. All of that happened here, prior to the foreclosure sale.

Respondents cite *Spencer v. Jameson*, 147 Idaho 497, 211 P.3d 106 (2009), for the proposition that "under the Idaho Trust Deeds Act, the legislature did not intend for a sale to be set aside once a trustee accepts a bid as payment in full unless there are issues surrounding the notice of the sale." The section of Idaho's Trust Deeds Act addressed to finality, and the section discussed in *Spencer*, is Idaho Code section 45-1508, which provides that

> [a] sale made by a trustee under this act shall foreclose and terminate all interest in the property covered by the trust deed of all persons to whom notice is given under section 45-1506, Idaho Code, and of any other person claiming by, through or under such persons and such persons shall have no right to redeem the property from the purchaser at the trustee's sale. The failure to give notice to any of such persons by mailing, personal service, posting or publication in accordance with section 45-1506, Idaho Code, shall not affect the validity of the sale as to persons so notified nor as to any such persons having actual knowledge of the sale. Furthermore, any failure to comply with the provisions of section 45-1506, Idaho Code, shall not affect the validity of a sale in favor of a purchaser in good faith for value at or after such sale, or any successor in interest thereof.

In *Taylor*, this Court determined the foreclosure sale "was void for failure to comply with Idaho Code § 45-1505(2), which requires that there be a default in order to sell the real property secured by a deed of trust" and that Idaho Code section 45-1508 did not suggest that the sale was nevertheless final. *Id.* at 142, 59 P.3d at 313. *Spencer* does not conflict with this view of Idaho Code section 45-1508. *Spencer* involved a foreclosure sale in which the original owners of property challenged the sale of that property on the ground that the bidder failed to comply with Idaho Code section 45-1506(9), which requires full payment of the bid at the time of sale. *Spencer*, 147 Idaho at 503–04, 211 P.3d at 112–13. This Court held that the sale was final and valid despite that failure, though the terms of Idaho Code section 45-1508 might initially have suggested otherwise. *Id. Spencer* is irrelevant to this Court's prior holding in *Taylor* that, where there is no default at the time of a foreclosure sale, the sale is not a "sale made by a trustee under this act" and so is not valid.

The district court granted summary judgment to FNMA, based on its conclusion that there was no valid agreement between Russell and Homeward to modify his loan in accordance with the terms of the first PMA. There is certainly evidence in the record to support the proposition that Russell and Homeward did enter into a valid agreement to modify the loan. That

is an issue to be determined on remand. Because the district court erred in granting summary judgment to Homeward, it also erred in granting summary judgment in favor of FNMA. We therefore vacate the judgment in favor of FNMA and remand the case for further proceedings consistent with this opinion.

**C. The Hafers are not entitled to fees on appeal under Idaho Code section 12-120(3).**

The Hafers request fees on appeal under Idaho Code section 12-120(3), claiming that the present dispute arose out of a commercial transaction. That section provides that "[i]n any civil action to recover on . . . any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs." I.C. § 12-120(3). The statute defines "commercial transaction" to mean "all transactions except transactions for personal or household purposes." *Id.* "This Court has interpreted I.C. § 12-120(3) to mandate the award of attorney fees on appeal as well as at trial." *Farm Credit Bank of Spokane v. Stevenson*, 125 Idaho 270, 275, 869 P.2d 1365, 1370 (1994).

In *Bajrektarevic v. Lighthouse Home Loans, Inc.*, 143 Idaho 890, 155 P.3d 691 (2007), this Court held that a breach of contract claim involving the refinancing of a home loan was not a commercial transaction under Idaho Code section 12-120(3) because the transaction was for "personal or household purposes." *Id.* at 893, 155 P.3d at 694. The transaction at issue here was to modify the Hafers' home loan and is likewise for "personal or household purposes." It was therefore not a commercial transaction under Idaho Code section 12-120(3) and that statute does not authorize fees on appeal.

## V.
## CONCLUSION

We vacate the judgment in favor of Homeward on the Hafers' first, third, and fourth causes of action, as well as the judgment in favor of FNMA on its claim for possession, and remand the case for further proceedings consistent with this opinion. The Hafers' request for attorney fees pursuant to Idaho Code section 12-120(3) is denied. Costs are awarded to the Hafers.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.