Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/07/2019 09:06 AM CDT

IN RE ESTATE OF DEMARIONT'E
BROWN-ELLIOTT, DECEASED.
ADRIENNE ELLIOTT, SPECIAL ADMINISTRATOR OF THE
ESTATE OF DEMARIONT'E BROWN-ELLIOTT, DECEASED,
APPELLEE, V. BERNARD BROWN, SR., APPELLANT.

___ N.W.2d ___

Filed May 7, 2019.    No. A-18-177.

1. **Decedents' Estates: Appeal and Error.** In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court.
2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.
3. ____: ____. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.
4. **Trial: Evidence: Appeal and Error.** To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded.
5. **Wrongful Death: Damages.** When a judgment for damages results from a wrongful death action, the proceeds shall be paid to the decedent's next of kin in the proportion that the pecuniary loss suffered by each bears to the total pecuniary loss suffered by all such persons.
6. ____: ____. In an action for wrongful death of a child, recoverable damages include parental loss of the child's society, comfort, and companionship.
7. **Wrongful Death: Damages: Words and Phrases.** The term "society" embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection.

- 197 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

8. **Appeal and Error.** Absent plain error, errors argued but not assigned will not be considered on appeal.

Appeal from the County Court for Douglas County: JEFFREY L. MARCUZZO, Judge. Affirmed.

Loretta D. Collins, of Collins Law Office, P.C., L.L.O., for appellant.

James Martin Davis, of Davis Law Office, for appellee.

PIRTLE, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Bernard Brown, Sr., appeals from an order of the county court for Douglas County, which awarded to Adrienne Elliott the entire wrongful death settlement that was recovered following their son's death. On appeal, Brown challenges the county court's determinations related to his relationship and contact with his son who had died and the division of the wrongful death settlement proceeds. Brown also contends that the county court ignored his exclusion from the wrongful death settlement negotiations. For the reasons set forth herein, we affirm the order of the county court.

## BACKGROUND

Demariont'e Brown-Elliott, the son of Brown and Elliott, died on November 14, 2014, as the result of drowning in the swimming pool at his middle school in Omaha, Nebraska, during physical education class. He was 12 years old at the time.

On September 24, 2015, Elliott applied to be appointed the special administrator of the estate of Demariont'e, and Brown consented to Elliott's appointment. On September 26, Brown also waived notices of all proceedings except those notices related to distribution of the estate's assets. On November 24, the county court appointed Elliott the special administrator

- 198 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

of the estate of Demariont'e. Brown then filed on December 29 a demand for notice of all filings and orders related to the estate of Demariont'e.

Omaha Public Schools and its insurers agreed to a wrongful death settlement in the amount of $250,000 to be paid to the estate of Demariont'e. As special administrator of the estate, Elliott applied on April 29, 2016, for the court's approval of that settlement offer. On June 29, the county court approved the $250,000 wrongful death settlement that was reached between the estate of Demariont'e and Omaha Public Schools.

On June 24, 2016, Elliott applied for authority to distribute the settlement funds. She suggested that after paying attorney fees in the amount of $83,564, the remaining $166,436 ought to be distributed to her as the surviving mother of Demariont'e. Elliott also applied on June 24 for authority to distribute solely the portion of the settlement to be paid for attorney fees. On June 27, Brown applied for an equitable distribution of the wrongful death settlement funds and alleged that he was denied a "meaningful opportunity" to be heard during the settlement negotiations. Brown also applied for a distribution of $41,375 to be paid for his attorney fees. On June 29, the court authorized the distribution of $83,564 for attorney fees and expenses incurred by the attorney who represented Elliott as special administrator of the estate. On July 6, the court ordered that an evidentiary hearing would be held to determine the appropriate distribution of the remaining settlement proceeds.

An evidentiary hearing was held on September 13, 2016, at which testimony was received from Elliott, Brown, and Bernard Brown-Elliott, Jr. (Bernard Jr.), who was the younger brother of Demariont'e. Demariont'e was born to Brown and Elliott in May 2002. Elliott lived with her mother during her pregnancy and moved into an apartment with Brown following the birth of Demariont'e. Elliott testified that Demariont'e was 8 or 9 months old when they moved into the apartment with Brown and that they lived with Brown for less than a

- 199 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

year. Brown and Elliott had another son together, Bernard Jr., who was born in August 2003.

Elliott testified that Brown provided nothing for Demariont'e while they lived together: "He wouldn't even change diapers." She acknowledged that Brown was listed as the head of household on rental documents, but that was only because she was too young to be listed. She said they lived off her earnings while together because Brown was unemployed. Brown testified that he had provided for Elliott before she was pregnant, while she was pregnant, and after Demariont'e was born. Brown also testified that he was the primary income earner while he lived with Elliott. He stated that he mowed and moved people's possessions through his employment as a laborer.

Because Elliott was only 17 years old at the time of the birth of Demariont'e, she said that Brown and she waited to marry until she turned 18 years old in April 2003. Brown was over 30 years old at the time of their marriage. Elliott filed for divorce in 2004, approximately a year after marrying Brown. Elliott testified that she petitioned for divorce after being granted a protection order against Brown, because he had been physically abusive toward her and damaged her property. She stated that Brown had driven past her home and shot at her sons, which also led to her being granted a protection order. Brown testified that he was never charged with shooting at Elliott and her sons. Elliott and Brown's divorce was finalized in April 2005. Elliott received sole custody of her sons, and Brown was ordered to pay monthly child support of $100.

Elliott testified that the court allowed Brown to have supervised visitations after the divorce decree was entered and that he did exercise that right on two or three occasions. Brown testified that he did not continue seeking supervised visitations, because he felt like the supervision requirement was unfair. Brown's next contact with his sons was in 2006, when Elliott took them to meet with Brown for approximately 20

- 200 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

minutes in a parking lot. Elliott testified that visitations were encouraged and organized through Brown's father.

Brown was next in contact with his sons 4 years later, in 2010. Elliott testified that Brown visited them at their home for about an hour and said that Brown "[d]id the whole dad spiel." She said it was the first time that Brown had really seen Bernard Jr. since he was a baby. Brown also testified regarding a visit in 2010, but he said that he stayed in Elliott's home for two nights. As Brown described it, he returned from Georgia, where he had been living, and was social with Elliott, playing cards, drinking, and "reminiscing." Brown testified that he helped Demariont'e clean his room and took his sons to the store for snacks during his stay.

The next interaction was 4 years later, approximately a week before Demariont'e died in 2014. Elliott testified that they unexpectedly ran into Brown at a grocery store one morning. She said the interaction lasted about 2 minutes. Brown described the incident similarly. Elliott said she was surprised to see Brown on that day because she believed he was living in Georgia. Brown testified that he lives in Georgia "off and on" and is "back and forth" between Omaha and Georgia.

Elliott testified that she cared for her sons without help from Brown aside from limited and sporadic child support payments. She testified that Brown never helped with rent, groceries, school expenses, or household items. Elliott took Demariont'e to school, picked him up, and helped him with his homework. She testified that Brown had never interacted with any teachers of Demariont'e or aided his education. Additionally, Elliott testified that Demariont'e was in band, choir, football, and basketball. When Elliott was not working, she attended the basketball and football games of Demariont'e but she testified that Brown had not attended a single game.

Brown acknowledged that he had only provided shelter and food to his sons up until the time Elliott and he divorced, but he also testified that he had spent $800 to $1,000 on toys and clothes for his sons one Christmas. Brown further testified

- 201 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

that he tried to spend time with his sons but that Elliott "put up a road block" and would not allow him to see them. Brown acknowledged that two felony convictions had taken him away from spending time with Demariont'e. He served sentences of 2 years and of 6 months.

Records from the Nebraska Department of Health and Human Services showed that Brown neglected making court-ordered child support payments. The records show that from June 1, 2004, through March 3, 2016, Brown made only seven child support payments. The two largest payments were income tax refunds that were garnished in order to pay portions of Brown's past-due child support obligation. Each of the five remaining payments that Brown made was less than $100. Despite the handful of payments and two garnishments, Brown still owed $9,612.44 in past-due child support as of March 3, 2016.

Bernard Jr., who was 13 years old at the time of the hearing, testified that he had a close relationship with his brother until he died. Bernard Jr. also testified that he did not recall seeing Brown at any time prior to their brief run-in at the grocery store in 2014. He testified that he remembered receiving no presents, visits, or telephone calls from Brown prior to the death of Demariont'e.

Based on the evidence received, the county court entered an order on November 4, 2016, which awarded the entirety of the settlement proceeds to Elliott. The court found that Brown had "less than two hours of contact" with Demariont'e during his lifetime. It also found that Brown's extremely limited contact with Demariont'e was not the same character of parental love and affection that an ordinarily caring, loving parent would exercise. The court found that Elliott had "constant contact" with Demariont'e throughout his lifetime and that she exhibited the type of parental care and love that is associated with an ordinary parent-child relationship. Noting the disparity in Brown's and Elliott's contact with Demariont'e during his lifetime, the court held that awarding Brown any portion

of the settlement proceeds was unjustified and unwarranted. Accordingly, the county court awarded the remaining wrongful death settlement proceeds, or $166,782, to Elliott.

Brown now appeals from the order of the county court.

## ASSIGNMENTS OF ERROR

Brown assigns, restated and renumbered, that the county court erred in its determinations related to the parent-child relationship between Brown and Demariont'e, the amount of contact Brown had with Demariont'e, and the division of the wrongful death settlement proceeds. Brown also assigns that the county court erred in ignoring the appearance of Elliott's "unclean hands" by excluding him from settlement negotiations.

## STANDARD OF REVIEW

[1-3] In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Panec*, 291 Neb. 46, 864 N.W.2d 219 (2015). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id*.

## ANALYSIS

### BROWN'S RELATIONSHIP WITH DEMARIONT'E

Brown alleges that the county court abused its discretion, manifested bias and prejudice, and made findings that were contrary to the evidence in relation to the parent-child relationship between Brown and Demariont'e. Brown specifically takes issue with the court's findings that his relationship with Demariont'e "did not include any semblance of normal parental love and affection that would be exercised by a caring,

- 203 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

loving parent." Upon our review, we find that the county court did not err in its findings related to Brown's relationship with Demariont'e.

The evidence produced at trial showed that Brown was generally present as a parent to Demariont'e for only his first 2 to 3 years of life. This changed following Brown's divorce from Elliott. It is not uncommon for parent-child relationships to change as a result of divorce. However, the evidence shows that Brown's relationship with Demariont'e essentially vanished during the decade leading up to the death of Demariont'e.

Although the court awarded Brown the right to supervised visitations with his sons, Brown only exercised this right a few times during the time surrounding his divorce from Elliott. Brown acknowledged that he did not seek additional supervised visitations because he felt that the supervision requirement was unfair.

Brown only saw Demariont'e three more times during the almost 10 years thereafter. The evidence showed that Brown saw Demariont'e for about 20 minutes in 2006. Elliott testified that in 2010, Brown visited for about an hour; however, Brown testified that he actually stayed with Elliott and their sons for two nights. The last time Brown interacted with Demariont'e was for a few minutes, approximately a week before his death in 2014.

Although time is not the sole measure of a parent-child relationship, Brown provided no evidence to show that his relationship with Demariont'e included "any semblance of normal parental love and affection." Bernard Jr. testified that Brown never called or sent gifts to them while Demariont'e was alive. Elliott testified that Brown never aided in the education of Demariont'e or attended his extracurricular activities. Brown acknowledged that the only time he ever provided shelter and food for Demariont'e was during the first years of his life, up until the time of Brown's divorce from Elliott. Moreover, child support records show that Brown

- 204 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

owes $9,612.44 in past-due child support. Brown made only seven child support payments during a 12-year time period. The largest two payments came by way of involuntary income tax refund garnishments. Brown testified that he quit filing tax returns following the second garnishment.

Based on our review of the record, we find that the county court's findings related to Brown's parental relationship with Demariont'e were not contrary to the evidence. We further find that the county court's findings exhibited neither bias nor prejudice, nor were they arbitrary or capricious.

BROWN'S CONTACT WITH DEMARIONT'E

Brown next argues that the county court erred in finding that "Brown had very little contact, less than two hours of contact with [Demariont'e] during his 12 year life span." Brown also argues that the county court erred in finding that, if assigned a percentage, his contact with Demariont'e "would amount to far less than 1%." Brown contends that these findings were contrary to the evidence, an abuse of the court's discretion, arbitrary and capricious, and manifested bias against Brown. Upon our review, we find that the county court's finding with respect to the amount of Brown's contact with Demariont'e during his lifetime was in error. However, we find that the county court's conclusion with respect to the amount of contact existing between Brown and Demariont'e is supported.

[4] To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about such evidence admitted or excluded. *Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007). The evidence is undisputed that Brown had more than 2 hours of contact with Demariont'e throughout his lifetime. Both parties acknowledge that Brown was present immediately following the birth of Demariont'e and for the period until Brown and Elliott divorced 2 years later. In calculating that Brown spent only 2 hours with Demariont'e,

- 205 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

the county court may have mistakenly excluded the period of his infancy.

As recounted above, Brown visited Demariont'e under supervision two or three times within his first few years of life. Thereafter, he saw Demariont'e on only three more occasions. In 2006, Brown was with Demariont'e for approximately 20 minutes, and in 2014, Brown was with Demariont'e for only a few minutes. In 2010, Brown was either with Demariont'e for 1 hour, as recounted by Elliott, or for a few days, as recounted by Brown.

Although the county court may have miscalculated the precise amount of time that it believed Brown had spent with Demariont'e, its decision was predicated on Brown's near total absence in the life of Demariont'e following the parties' divorce, not a precise calculation. The record is clear that Brown participated in the life of Demariont'e on an extremely limited basis, irrespective of the precise amount of time. The county court's decision and rationale is only negligibly impacted, if at all, by its miscalculation. Thus, the county court's finding does not constitute reversible error.

### Division of Wrongful Death Settlement

Brown contends that the county court erred in awarding the entirety of the wrongful death settlement proceeds in the amount of $166,782 to Elliott while completely excluding him. Based on our review of the record, we agree with the county court that distributing the settlement proceeds entirely to Elliott conformed to the law and was supported by the evidence.

[5-7] When a judgment for damages results from a wrongful death action, the proceeds shall be paid to the decedent's next of kin "in the proportion that the pecuniary loss suffered by each bears to the total pecuniary loss suffered by all such persons." Neb. Rev. Stat. § 30-810 (Reissue 2016). In an action for wrongful death of a child, recoverable damages include parental loss of the child's society, comfort, and

- 206 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

companionship. *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). The term "society" embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection. *Id*.

Our appellate courts have not often examined § 30-810 in the context of one parent's near total absence in their deceased child's life. However, the issue did arise in a case nearly 80 years ago. In *In re Estate of Lucht*, 139 Neb. 139, 296 N.W. 749 (1941), a 14-year-old boy died as the result of a motor vehicle accident, which led to a wrongful death award of $3,261.78. His parents divorced within the year following his birth. *Id*. Custody was awarded to his mother, and the court noted that "[f]rom the time the son was about one year old until his death, his father and himself were as strangers to each other." *Id*. at 141, 296 N.W. at 750. Applying a statute essentially identical to our present § 30-810, the court in *In re Estate of Lucht* held that the decedent's father had suffered no pecuniary loss on occasion of his son's death.

Here, as in *In re Estate of Lucht*, the proper division of wrongful death settlement proceeds is based on the proportion of the pecuniary loss suffered by each of the parents of Demariont'e relative to the total pecuniary loss. Therefore, the county court had to compare Brown's pecuniary loss to that of Elliott's pecuniary loss and determine their respective shares of the settlement reached between the estate of Demariont'e and Omaha Public Schools.

Much like the court in *In re Estate of Lucht*, we confront a situation in which the parents' pecuniary loss on occasion of their son's death could not be more antithetical. Our record demonstrates that Elliott suffered far greater pecuniary loss from the death of Demariont'e—that is, she received the overwhelming benefit of his love, affection, and companionship while he was alive. Elliott was the sole parent who enjoyed the companionship of Demariont'e for nearly a decade. Elliott

- 207 -

Nebraska Court of Appeals Advance Sheets
27 Nebraska Appellate Reports
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

described that Demariont'e played basketball and football. She attended those games while Brown did not. Elliott testified that she took Demariont'e to school each day, picked him up from school, and helped him with his homework. Brown was not involved in the education of Demariont'e.

Although we cannot say that Brown suffered no loss by the death of Demariont'e, based on our record, Elliott's loss of the society, comfort, and companionship of Demariont'e is exponentially greater than that suffered by Brown. Brown chose to invest little in his relationship with Demariont'e. As a result, his loss of society, comfort, and companionship is miniscule as compared to the deep relationship that Elliott enjoyed with Demariont'e. Therefore, we agree with the county court's decision to award Elliott the entirety of the settlement proceeds in the amount of $166,782.

Wrongful Death Settlement Negotiations

Brown contends that the county court erred in ignoring Elliott's "unclean hands" and the appearance of impropriety due to Brown's exclusion from settlement negotiations where his interests differed from Elliott's interests. Our record contains little, if any, support for Brown's contention that he was excluded from settlement negotiations, and thus, we find no merit to this claimed error.

We note that Brown consented on September 26, 2015, to Elliott's appointment as special administrator and waived notices of any matters except for those related to distribution of the estate's assets. On December 29, Brown then demanded that he be given notice of all filings related to the estate of Demariont'e. Elliott applied on April 29, 2016, for the court's approval of the $250,000 settlement, which the court approved on June 29. In his application for equitable distribution of settlement funds filed on June 27, Brown alleged that he was denied a meaningful opportunity to be heard during settlement negotiations. However, there is nothing in our record which indicates that Brown contested the proposed settlement amount at the time of the June 29 hearing.

- 208 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
27 NEBRASKA APPELLATE REPORTS
IN RE ESTATE OF BROWN-ELLIOTT
Cite as 27 Neb. App. 196

Brown does not otherwise describe in his brief on appeal or in the evidence offered to the county court how he was excluded from settlement negotiations. He also does not describe the ways in which his interests differed from Elliott's such that their positions during settlement negotiations were adverse. Moreover, having now determined that Brown is entitled to no portion of the wrongful death settlement, we note by extension that he would not stand to benefit from any additional or alternative settlement negotiations. Based on the record before us, we find no merit to Brown's claim that he was meaningfully or detrimentally excluded from settlement negotiations.

## UNASSIGNED ERROR

[8] Brown argues that the county court erred in failing to find that Elliott had substantially interfered with his rights as the noncustodial parent of Demariont'e. He does not assign this error, however. Absent plain error, errors argued but not assigned will not be considered on appeal. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). We find no plain error regarding Brown's contention that Elliott interfered with his parental rights. Accordingly, we will not consider Brown's arguments related to this contention.

## CONCLUSION

Based on the foregoing, we find that the county court did not err in its findings related to distributing the entirety of the wrongful death settlement proceeds to Elliott. Thus, we affirm the order of the county court.

AFFIRMED.