# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 51745-2024

| | | |
|---|---|---|
| ROSSMAN LAW GROUP, PLLC, | ) | |
| | ) | |
| Petitioner-Respondent, | ) | Boise, August 2025 Term |
| | ) | |
| v. | ) | Opinion filed: November 19, 2025 |
| | ) | |
| DENNY HOLCOMB, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Respondent-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HILLARY CARRAWAY, | ) | |
| | ) | |
| Respondent-Respondent on Appeal. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Cynthia Yee-Wallace, District Judge.

The decision of the district court is <u>reversed</u>.

Arkoosh Law Offices, Boise, for Appellant. Joshua A. Bishop argued.

Rossman Law Group, PLLC, for Respondent Hillary Carraway. Mallam J. Prior argued.

---

ZAHN, Justice.

This case concerns how to divide settlement proceeds between two parents who filed separate wrongful death actions following the death of their adult son. Twenty-two-year-old Connor Holcomb was killed by a drunk driver. Connor's parents, Hillary Carraway and Denny Holcomb, each filed a wrongful death suit. Their suits were later consolidated and settled on the eve of trial. Hillary and Denny could not agree on how to divide the settlement proceeds. The holder of the proceeds, Rossman Law Group, PLLC, filed an interpleader action to resolve the dispute. Following an evidentiary hearing, the district court divided the net settlement funds, awarding 75% to Hillary and 25% to Denny after concluding that Denny failed at various times to

fulfill his natural and legal obligations to care for and support Connor. Denny appeals, arguing that the district court erred when it failed to award him 50% of the settlement proceeds.

We hold that the district court erred in its decision because it failed to act consistently with the legal standards applicable to the specific choices available to it. Wrongful death damages are forward-looking and intended to compensate for the loss of future support, including the lost companionship, protection, bodily care, intellectual culture, and moral training the decedent would have provided had he survived. The district court did not apportion the settlement proceeds based on Hillary's and Denny's respective losses but instead apportioned them based on their past conduct by evaluating their parental behavior toward Connor during his life. We therefore reverse the district court's decision and judgment and remand for further proceedings.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Twenty-two-year-old Connor Holcomb was killed on May 19, 2021, after his vehicle was rear-ended by a semitruck while he was stopped at a stoplight. The semitruck driver had a blood alcohol content over 0.2% and ran three red lights before crashing into the back of Connor's car. Hillary Carraway, Connor's mother, and Denny Holcomb, Connor's father, filed separate wrongful death lawsuits against the driver and the owner of the semitruck and trailer. At that time, Hillary was represented by Rossman Law Group and Denny was represented by Monteleone Law Offices. Hillary and Denny stipulated to consolidate their cases. The parties participated in mediation shortly before trial and reached a settlement.

The settlement proceeds were paid to Hillary's attorneys, Rossman Law Group. However, Hillary and Denny could not agree on how to divide the proceeds. Rossman Law Group placed the funds in a trust account and filed (1) an Application for Interpleader and (2) a Motion to Interplead and for Initial Order on the Pleadings, requesting that the district court determine how to divide the settlement proceeds between Hillary and Denny.

The district court held a hearing on the interpleader application. Denny appeared at the hearing with his legal counsel but advised the district court that he was terminating his attorney and would represent himself. The district court granted the interpleader application, ordered that Hillary and Denny interplead and defend the action, and set an evidentiary hearing for the following month.

2

At the evidentiary hearing, the district court heard testimony from several individuals, including Hillary and Denny. Following the hearing, the district court issued written findings of fact and conclusions of law from which we derive the following.

Hillary and Denny's romantic relationship ended when Connor was around four years old. From approximately ages five to ten, Connor lived predominantly with Hillary but spent some weekends with Denny. Hillary later married Darren Carraway, and she and Connor moved in with Darren. When Connor was ten, Hillary was granted full legal and physical custody of Connor. Denny did not attend the proceedings related to the custody order.

Hillary continued to allow Connor to occasionally see Denny on weekends. Denny had been ordered to pay monthly child support for Connor, but he did not make the payments. Denny had a chronic medical condition and had multiple surgeries. For approximately eight years, Denny received monthly disability payments from the Social Security Administration on behalf of Connor. However, Denny did not disclose the payments to Hillary or turn over any of Connor's payments to her. It is not clear what Denny did with the payments he received on Connor's behalf. By the time Hillary was granted full legal and physical custody of Connor, Denny had been convicted of three DUIs and Hillary was aware that Denny was abusing prescription pain medication.

When Connor was sixteen years old, Hillary caught him with marijuana. Connor ran away to Denny's house. Hillary permitted Connor to live with Denny from then on. Prior to moving in with Denny, Connor was a good student and participated in football and wrestling. After moving in with Denny, Connor quit all sports and had poor attendance at school. Hillary saw Connor every couple of weeks and talked with him on the phone several times each week. Neither Hillary nor Denny sought a custody modification to award Denny legal and physical custody of Connor.

Connor graduated from high school and continued living with Denny. Connor got a job working for an acquaintance of Hillary and Darren's. He began dating a young woman, and she later moved in with Connor at Denny's home. Connor and his girlfriend lived with Denny for approximately a year. During this time, Denny routinely used illegal drugs with Connor and his girlfriend. The girlfriend testified that Denny would give her and Connor money to purchase heroin or cocaine, and they would all use the drugs together at Denny's house.

When Connor was nineteen, he overdosed on fentanyl at Denny's house and was rushed to the hospital. Denny called Hillary and told her that Connor was on his way to the hospital after a

drug overdose and that Denny had performed CPR on Connor to revive him. Hillary and Connor's girlfriend stayed with Connor at the hospital. Neither recalled Denny visiting Connor at the hospital. At this time, Hillary did not know where Connor had obtained the fentanyl.

A few months after his overdose, Connor was found passed out in his car. He was charged with driving under the influence and possession of drug paraphernalia. Connor then went to rehab. Hillary participated in a three-day parent meeting with Connor at rehab. She asked Connor where he obtained the fentanyl on which he overdosed. Connor refused to tell her.

After Connor completed rehab, he lived with Denny for a few weeks. Connor and his girlfriend then moved into a duplex that Hillary found for them. A roommate later moved in with them. The roommate had been previously incarcerated for selling heroin. The roommate dealt drugs to Connor and his girlfriend and to others. Connor resumed using drugs, including using them with Denny, approximately four to five months after leaving rehab.

After living in the duplex for approximately a year, Connor and his girlfriend moved into a guesthouse on Hillary and Darren's property. They lived there for about two years, up until Connor's death. Connor continued using illegal drugs, including with Denny, up to his death. Connor's autopsy report indicated that he had heroin in his system at the time of his death, but there was no evidence that heroin intoxication played any role in the accident.

Prior to Connor's death, his employer contacted Hillary to advise her that Connor was not doing well emotionally and had fallen asleep on some of the equipment. Connor sometimes worked in Valley County and would either stay with his co-workers at a house in McCall or would stay at Hillary and Darren's cabin in Cascade. After Connor's death, Denny texted Connor's employer and asked him to retrieve Connor's belongings and not tell Hillary and Darren what he found. The employer discovered needles and syringes in Connor's shaving kit and burned black residue on Connor's clothes. The employer called Darren to report what he had found. Darren told the employer to not to touch any of it and Darren would call the sheriff.

Hillary testified that her "life ha[d] been hell" since the day Connor died. She stated that, on most days, she could not wait for bedtime so she could turn off her mind. Hillary explained that when she wakes up in the morning, she wishes she could sleep longer and that her two remaining children kept her going. Darren testified that Hillary and Connor had an unbelievable relationship and never had any big arguments or fights. He testified that, after Connor's death, Hillary was not the same person, and it had impacted their marriage and her relationship with her other children.

Denny testified that he loved Connor and Connor's girlfriend. He stated that Connor was his world and that he and Connor leaned on each other for everything. After Connor's death, Denny was distraught and could not function. Denny said that he made some bad choices and had tried to learn from them, but everyone knew how much Connor meant to Denny. Denny also said that Connor was an adult who could do whatever he wanted to do.

Regarding the division of settlement proceeds, Denny testified that, prior to mediation, he and Hillary agreed to split the settlement proceeds evenly, but Hillary later changed her mind and would only agree to an 80/20 division in favor of Hillary. Hillary testified that, at mediation, she learned from Connor's girlfriend that Connor used drugs with Denny up to the date of his death. Hillary stated this was the first time she learned that Denny had done illegal drugs with Connor for some time and that their shared drug use continued up to Connor's death.

Denny asked the court to award him 50% of the proceeds. Hillary asked that Denny receive none of the proceeds because he abused drugs with Connor. Alternatively, Hillary asked that any proceeds awarded to Denny be placed in a trust so they could only be used for lawful activities.

The district court concluded it was within its equitable jurisdiction to divide the settlement proceeds. It noted that, in wrongful death cases, Idaho courts have followed a "loss of support" theory of damages that awards damages for the lost companionship, protection, bodily care, intellectual culture, and moral training the decedent would have provided had they survived. The district court noted that it had not located any cases analyzing the apportionment of wrongful death proceeds between parents when the quality of one individual's parenting was called into question. The district court then analyzed cases from other jurisdictions that addressed apportionment in this circumstance. It observed that some courts held that the measure of a parent's loss is not diminished by the quality of their parenting. It also noted, however, that other courts had concluded that a parent was entitled to a lower percentage, or none, of the settlement proceeds when the parent abandoned or failed to care for their child.

After considering the caselaw and the evidence before it, the district court apportioned 75% of the proceeds to Hillary and 25% to Denny. The court concluded that Hillary and Denny each loved Connor and suffered pain and loss because of his death. However, the district court concluded that Denny failed at various times to fulfill his natural and legal obligations to care for and support Connor. The court pointed to Denny's failure to pay child support and his retention of disability benefits paid on Connor's behalf. It also cited evidence that Denny failed to contribute

to Connor's funeral expenses. The district court further concluded that Denny neglected to care for Connor and deviated from the "normal care, parental love, and affection expected from a parent" when Denny regularly used illegal drugs with Connor and gave Connor money to purchase drugs. In contrast, the district court found that both Hillary and Darren financially supported Connor, helped and supported him while he went to rehab, helped him find a job, and gave him a place to live. The district court concluded that the evidence supported an uneven division of the settlement proceeds; however, it declined Hillary's request to place Denny's portion of the funds into a trust that imposed conditions on Denny's use of the funds.

Denny appeals the district court's decision.

## II.     ISSUES ON APPEAL

1. Whether the district court erred in apportioning the settlement proceeds.
2. Whether Hillary or Denny is entitled to attorney fees on appeal.

## III.     STANDARDS OF REVIEW

An action for interpleader invokes the equitable jurisdiction of the trial court. *See McCauley v. Sears*, 3 Idaho 676, 682, 34 P. 814, 816 (1893); *see also* 48 C.J.S. *Interpleader* § 4 (May 2025 update); 44B Am. Jur. 2d *Interpleader* § 18 (May 2025 update). "When one party is seeking recovery in equity, the trial court is vested with [broad] discretion in determining the 'equities' between the parties." *Alsco, Inc. v. Fatty's Bar, LLC*, 166 Idaho 516, 524, 461 P.3d 798, 806 (2020) (alteration in original) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018)). When reviewing a discretionary decision of the district court, we examine "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194.

## IV.     ANALYSIS

### A. The district court erred in apportioning the settlement proceeds because it failed to properly apply the law governing wrongful death damages.

Denny argues that the district court erred because, as Connor's father, he is entitled to 50% of the funds. Denny asserts that he and Hillary entered into a valid oral contract to split the settlement funds evenly. He also contends that he is entitled to 50% of the settlement funds under Idaho's wrongful death statute and the district court erred in relying on his moral failings to justify an unequal award.

*1. Denny failed to establish the existence of an enforceable contract to equally divide the settlement proceeds.*

Denny first argues that, prior to mediation, he and Hillary orally agreed to equally divide the settlement proceeds. He asserts that the district court's written order contains a factual finding that the proceeds would be split 50/50 and that the district court erred when it failed to enforce the contract. Hillary responds that Denny failed to preserve a breach of contract argument because he never raised that theory before the district court. Turning to the merits of the argument, Hillary argues that when the district court's statement concerning a 50/50 split is read in context with the rest of the decision, the statement simply acknowledges Denny's belief that the proceeds would be split evenly.

We begin with Hillary's preservation argument and hold that Denny preserved his breach of contract argument for appeal. "[A] party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing *or* a party preserves an issue for appeal if the trial court issues an adverse ruling." *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). "An issue is not preserved when a party argues under a different theory on appeal than the one argued before the district court." *Streamline Builders, LLC v. Chase*, 174 Idaho 765, 771, 560 P.3d 508, 514 (2024). However, "[a] party may refine issues that they have raised below with additional legal arguments so long as the substantive issue and the party's position on that issue remain the same." *Siercke v. Siercke*, 167 Idaho 709, 715–16, 476 P.3d 376, 382–83 (2020) (citing *Ada Cnty. Highway Dist. v. Brooke View, Inc.*, 162 Idaho 138, 142 n.2, 395 P.3d 357, 361 n.2 (2017)).

While Denny did not specifically argue that he was entitled to 50% of the settlement proceeds because he and Hillary entered into an enforceable oral contract, he did repeatedly argue that they had agreed to split the proceeds evenly:

> [DENNY]: . . . So I went and saw [a lawyer recommended by Hillary's lawyer] and agreed to it, and *we agreed to do 50/50* and go after the company together, play nice. And that's what I did.
>
> And as soon as the money changed -- or that day he started complaining about the money is when all of a sudden it went from *50/50 to 80/20 I think is what it started out at*. It was just ridiculous. I've been rolled over by them. I didn't see it coming. I thought this would be enough to not have these kind of games played. But that's what they're doing. . . .
>
> . . . .

[DISTRICT COURT:] Are you asking this [c]ourt to award you 50 percent of the settlement money?

[DENNY:] *It was supposed to be 50/50.*

[DISTRICT COURT:] *Why do you think you're entitled to 50 percent of that money from the wrongful death lawsuit*?

. . . .

[DENNY]: Just that -- *I mean, it's just ironic how everything changed right when I wouldn't cave on the 70/20 or 80/20 thing.* I just thought it was -- I went through the whole process of not pointing fingers and getting along with them, and then all of a sudden *that day they tried to change the money thing right before -- they wouldn't even -- they weren't even going to put in the offer to them*. I was told they wouldn't put the in the offer *unless I agreed to lower the price down*, that they weren't going to proceed. It's like how do they even dictate that. *I thought we were all on the same team*. But that's how they roll. They roll right over people when it doesn't go their way.

[DISTRICT COURT:] If this [c]ourt were to believe their testimony that the reason why they asked for the reduction was because they found out that you had been --

[DENNY:] It's --

[DISTRICT COURT:] Let me finish my question.

If this [c]ourt believes that the reason why they didn't want an equal distribution of that settlement money once they came to understand or received information that you had been using illegal drugs, through and include [sic] heroin, with your son, that that might be a game changer for them, do you still think -- *if this [c]ourt believes that testimony, do you still think it's reasonable that you get 50 percent of the settlement proceedings*?

[DENNY:] *I do*. But, I mean -- explain that to me one more time.

[DISTRICT COURT:] If I believe the testimony --

[DENNY:] Okay.

[DISTRICT COURT:] -- that the reason they wanted unequal distribution -- one of the reasons they wanted unequal distribution of the settlement funds, which sounds to me they learned through the mediation, if I believe that, if this [c]ourt believes that testimony --

[DENNY:] Well, let me -- can I --

[DISTRICT COURT:] -- my question is do you still think it's unreasonable that they would want an unequal distribution, it should not be 50/50?

[DENNY:] I just don't under -- *yes*.

[DISTRICT COURT:] Why is that?

8

[DENNY:] Well, see -- *let me put on record too that this didn't even come down -- this happened before they even talked to* [Connor's girlfriend]. This was before that.

(Emphasis added.)

Denny's statements to the district court are sufficient to preserve the issue on appeal. Denny consistently argued that he and Hillary agreed, prior to mediation, that they would split the proceeds evenly, but once they got to mediation, Hillary tried to convince him to accept less than 50%. He also consistently argued before the district court that he was entitled to 50% of the proceeds. His argument on appeal is a refinement of the statements he made in response to the district court's questions. His position that he had an agreement with Hillary to evenly split the proceeds and that he is entitled to 50% of the proceeds has not changed from the position he asserted below.

Turning to the merits of Denny's contract argument, we hold Denny failed to present evidence establishing that he and Hillary entered into an enforceable contract. "A contract must be complete, definite and certain in all its material terms, or contain provisions which are capable in themselves of being reduced to certainty." *Seward v. Musick Auction, LLC*, 164 Idaho 149, 158–59, 426 P.3d 1249, 1258–59 (2018) (quoting *Unifund CCR, LLC v. Lowe*, 159 Idaho 750, 752, 367 P.3d 145, 147 (2016)). "Formation of a valid contract requires a meeting of the minds as evidenced by a manifestation of mutual intent to contract. This manifestation takes the form of an offer followed by an acceptance." *Fed. Nat'l Mortg. Ass'n v. Hafer*, 158 Idaho 694, 701–02, 351 P.3d 622, 629–30 (2015) (quoting *Justad v. Ward*, 147 Idaho 509, 512, 211 P.3d 118, 121 (2009)). Determining whether there was a meeting of the minds is a question of fact. *Id.* (citing *Shields & Co. v. Green*, 100 Idaho 879, 882, 606 P.2d 983, 986 (1980)).

Denny had the burden of proving the existence of a contract because he was the party asserting that a contract existed. *Taylor v. Taylor*, 169 Idaho 806, 817, 504 P.3d 342, 353 (2022). He failed to meet his burden. The only evidence Denny presented concerning the alleged contract with Hillary was his own belief that it existed. He failed to present any evidence of: (1) who made the initial offer; (2) the terms of the initial offer; or (3) the other party accepting the offer. Denny has not cited us to any evidence in the record establishing the elements of an enforceable contract. Put differently, Denny presented no evidence that he and Hillary reached a meeting of the minds to equally divide the proceeds. Further, Hillary did not testify that she agreed to split the proceeds 50/50.

9

Denny largely hangs his hat on the district court's statement in its written decision that "Hillary and Denny agreed to pursue a lawsuit for the wrongful death of Conner [sic], and that they would split any proceeds evenly." We agree with Hillary that, when read in context, the district court's statement appears to acknowledge Denny's belief that he and Hillary had agreed to split the proceeds evenly.

The only evidence the district court cited to support the statement is Denny's testimony. Further, in the paragraph following the statement, the district court found that the parties did not agree on how to split the proceeds. This context indicates that the statement on which Denny relies was not a finding of fact that the parties entered into an enforceable contract.

However, even if the district court's statement constituted a finding of fact, the finding is erroneous because it is not supported by substantial and competent evidence. As previously discussed, whether a contract has been formed is generally a question of fact. *Fed. Nat'l Mortg. Ass'n*, 158 Idaho at 702, 351 P.3d at 630. "When an action is tried to a court sitting without a jury, appellate review is limited to ascertaining whether the trial court's findings of fact are supported by substantial and competent evidence." *Browning v. Ringel*, 134 Idaho 6, 10, 995 P.2d 351, 355 (2000). For the reasons discussed above, Denny failed to present evidence establishing the existence of an enforceable contract to equally split the settlement proceeds.

2. *The district court erred in apportioning the proceeds because it failed to properly apply Idaho law governing wrongful death damages.*

Denny argues that the district court erred when it failed to apply the "loss of support" theory of damages when apportioning the settlement award. Denny contends that Idaho law dictates that loss of support damages are forward-looking and intended to compensate for the lost future support that he could have expected to receive from Connor. Denny asserts that his conduct prior to Connor's death was irrelevant, and the district court erred when it relied on his past conduct to apportion the settlement proceeds. Hillary responds that, under Idaho caselaw, the "moral contributions" of a parent are relevant to the nature of the future relationship that Denny lost.

This Court discussed wrongful death damages in *Pfau v. Comair Holdings, Inc.*, 135 Idaho 152, 154–56, 15 P.3d 1160, 1162–64 (2000). We began our discussion with Idaho's wrongful death statute, Idaho Code section 5-311, and observed that it only provided one limitation on damages recoverable in a wrongful death action: "such damages may be given as under all the circumstances of the case as may be just." *Id.* at 154–55, 15 P.3d at 1162–63 (emphasis omitted) (quoting *Hepp v. Ader*, 64 Idaho 240, 245, 130 P.2d 859, 862 (1942) (quoting I.C. § 5-311(1))).

We then noted that, for the past century, Idaho courts followed a loss of support theory for wrongful death damages. *Id.* at 155, 15 P.3d at 1163.

"Following this theory, our earliest cases define 'just' damages to include recovery for loss of companionship, protection, bodily care, intellectual culture, and moral training 'providing it sufficiently appears that pecuniary damages resulted from such loss.'" *Id.* (first quoting *Wyland v. Twin Falls Canal Co.*, 48 Idaho 789, 796, 285 P. 676, 678 (1930); and then citing *Hepp*, 64 Idaho 240, 130 P.2d 859). "[D]amages available under [section] 5-311 for the death of a child have been defined as 'contributions which the parents might reasonably have expected to receive from the earnings of the deceased during minority and/or the comfort, society and companionship that the deceased would have afforded to the parents.'" *Id.* (quoting *Volk v. Baldazo*, 103 Idaho 570, 573, 651 P.2d 11, 14 (1982)).

The same measure of damages is reflected in Idaho Civil Jury Instruction 9.05, which instructs a jury how to determine the amount of damages that will reasonably and fairly compensate the plaintiff in a wrongful death action. The instruction states that the jury may consider several elements of damage: (1) the reasonable cost of the decedent's funeral; (2) the reasonable value of necessary medical care and expenses incurred prior to the decedent's death; (3) the reasonable value to the plaintiff of the loss of the decedent's services, training, comfort, and society; and (4) the plaintiff's loss of financial support from the decedent.

Although the district court acknowledged the loss of support theory, it did not apply the theory when apportioning the settlement proceeds between Hillary and Denny. The district court never evaluated: (1) the monetary contributions that Hillary and Denny could have expected to receive *from Connor*, and (2) the comfort, society, and companionship they could have expected to receive *from Connor*. Instead, it discussed and compared Hillary's and Denny's prior conduct and support *provided to Connor*. It concluded that an unequal apportionment of settlement proceeds was appropriate because "Denny failed at various times to fulfill his natural and legal obligations to care for and support" Connor, while Hillary and Darren had consistently provided emotional and financial support to Connor. In basing its apportionment solely on Hillary's and Denny's past conduct, the district court failed to act consistently with the legal standards applicable to the specific choices before it and therefore erred in its apportionment of the settlement proceeds.

The proceeds should have been apportioned by utilizing the loss of support theory discussed in our caselaw. Wrongful death damages are forward-looking and compensate for the

11

loss of future support. In cases involving the wrongful death of a child, the measure of wrongful death damages is not intended to compensate, reward, or punish each parent for their past parental acts. The district court erred by apportioning damages based on Denny's past behavior as a father instead of measuring and comparing the loss of comfort, society, and companionship that Connor would have afforded to Hillary and Denny in the future. *See Pfau*, 135 Idaho at 154–56, 15 P.3d at 1162–64. Because the district court applied the wrong measure of damages, we reverse its order, vacate its judgment, and remand for further proceedings.

The out-of-state cases cited in the district court's decision do not persuade us that it was appropriate to apportion damages based solely on Hillary's and Denny's past parental conduct. The cited cases indicate that the past conduct was considered for the purpose of assessing the nature of the parent's lost relationship with the deceased child, which informed the respective courts' assessments of the lost *future* relationship with the child. *Dove v. Carver*, 399 S.E.2d 216 (Ga. Ct. App. 1990); *In re Est. of Williams*, 585 N.E.2d 235 (Ill. Ct. App. 1992); *Miller v. Bunch*, 657 S.W.3d 890 (Ky. 2022); *Elliott v. Brown* (*In re Est. of Brown-Elliott*), 930 N.W.2d 51 (Neb. Ct. App. 2019); *Perry v. Williams*, 70 P.3d 1283 (N.M. Ct. App. 2003); *Fortune v. Lovely* (*In re Est. of Lovely*), 848 P.2d 51 (Okla. Civ. App. 1993).

For example, evidence of parental abandonment was considered to determine whether the absent parent could expect to have a future relationship with the decedent. *See Elliott*, 930 N.W.2d at 56. Considering past conduct for this purpose is entirely consistent with the loss of support measure of damages. The district court may need to assess the nature of the parent-child relationship that existed prior to the child's death before it can measure the loss of support suffered by the parent as a result of the child's wrongful death.

Because past parental conduct can be relevant to determining the nature of the relationship lost, we are unpersuaded by Denny's argument that we should hold that past conduct can never be considered when awarding damages in a wrongful death case. Denny's argument is premised on our caselaw holding that the loss of support theory of damages is forward-looking. He contends that because loss of support damages compensate for future loss of support, past parental conduct is irrelevant.

"Where an appellate court reverses or vacates a judgment upon an issue properly raised, and remands for further proceedings, it may give guidance for other issues on remand." *N. Idaho Bldg. Contractors Ass'n v. City of Hayden*, 164 Idaho 530, 540, 432 P.3d 976, 986 (2018) (quoting

*Urrutia v. Blaine County*, 134 Idaho 353, 359, 2 P.3d 738, 744 (2000)). "In offering guidance, however, we are aware that such guidance should only be given on issues that are absolutely necessary, and regarding issues that have a practical effect on *this appeal*; otherwise, we would be offering an impermissible advisory opinion cloaked as 'guidance.' " *Id.* (citing *State v. Manzanares*, 152 Idaho 410, 419, 272 P.3d 382, 391 (2012)).

We disagree with Denny and hold that past parental conduct may be relevant to measuring loss of support damages if the proponent of the evidence demonstrates that the conduct did or likely would impact the quality or expectation of the parent's future relationship with the decedent. Put differently, the relevance of this evidence is the impact the parent's past conduct would have on the parent's future relationship with the decedent. For example, if the parent's past conduct damaged the parent-child relationship to a degree that there is reason to believe the child would not want a future relationship with the parent, that evidence would be relevant to measuring the earnings, comfort, society, and companionship that the parent could have expected to receive from the child.

**B. Neither party is entitled to attorney fees on appeal.**

Hillary and Denny each request attorney fees on appeal pursuant to Idaho Code section 12-121. Idaho Code section 12-121 provides that "the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121.

Our decision today reverses the district court's order and remands this matter for further proceedings. For this reason, Hillary is not the prevailing party on appeal. Although Denny is the prevailing party on appeal, he failed to support his attorney fee request with any argument concerning why Hillary's defense of his appeal was frivolous, unreasonable or without foundation. "This Court 'will not consider a request for attorney fees on appeal that is not supported by legal authority or argument.' " *Marlar v. Gearhart*, 175 Idaho 262, ___, 564 P.3d 1195, 1202 (2025) (quoting *Bream v. Benscoter*, 139 Idaho 364, 369, 79 P.3d 723, 728 (2003)).

## V. CONCLUSION

For the reasons discussed, the district court erred in apportioning the settlement proceeds. We therefore reverse its order, vacate the judgment, and remand this matter for proceedings consistent with this opinion.

Chief Justice BEVAN, and Justices BRODY, MOELLER, and MEYER CONCUR.